UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SMART SYSTEMS INNOVATIONS, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 14 C 08053 |
| | ) |
| CHICAGO TRANSIT AUTHORITY, | ) Judge Edmond E. Chang |
| CUBIC CORPORATION, CUBIC | ) |
| TRANSPORTATION SYSTEMS, INC., and | ) |
| CUBIC TRANSPORTATION SYSTEMS | ) |
| CHICAGO, INC., | ) |
| | ) |
| Defendants. | ) |
| | ) |

**MEMORANDUM OPINION AND ORDER**

Since 2014, hordes of people have boarded subways and buses in the Chicago area by "tapping" fare-readers with the Ventra, a "contactless" card loaded with transit funds that also functions as a bank account-linked debit card. In this lawsuit, Plaintiff Smart Systems Innovations, LLC alleges that Defendants, the Chicago Transit Authority and three companies that the CTA contracted with to develop the Ventra system (Cubic Corporation, Cubic Transportation Systems, and Cubic Transportation Systems Chicago), are infringing on five of Smart Systems' patents. Smart Systems says that the patents cover the "open payment" system on which Ventra is based.[1] Defendants move for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) as to four of these patents, arguing that they

---

[1]Subject matter jurisdiction applies over this patent action under 28 U.S.C. §§ 1331, 1338(a).

assert rights to non-patentable subject matter in violation of the Patent Act, 35 U.S.C. § 101. R. 50. For the reasons that follow, the Defendants' motion is granted.

## I. Background

An open-payment fare system allows riders to conveniently and quickly access mass transit by using existing bankcards. Open payment eliminates the need for, and added operational cost of, dedicated fare-cards (or, to get even more antiquated, tokens or paper tickets). Smart Systems alleges that it was "an early developer of open payment technologies for public transit" in this country. R. 42, Am. Compl. ¶ 10. After observing the successful implementation of the technology in Seoul, South Korea,[2] Smart Systems sought to replicate that success in the United States, partnering with a Korean company before becoming "the owner of the fundamental United States patent enabling open payments for transit." *Id.* ¶ 11. Smart Systems applied for and was granted five related patents in total, the key claims of which are described next.

### A. The Unchallenged '044 Patent

The first patent was issued in October 1998 by the United States Patent and Trademark Office (PTO). It is numbered 5,828,044 (the '044 patent) and entitled "Non-Contacting Type Radio Frequency Recognizing Credit Card System," and was granted to a Korean firm, Kookmin Credit Card Co., Ltd. *Id.* ¶¶ 24, 26. Kookmin

---

[2]*See* Alex Marshall, *Seoul's Transit System Serves as a Model for America*, GOVERNING: THE STATES AND LOCALITIES, December 2012, http://www.governing.com/ columns/eco-engines/col-seoul-subway-offers-lesson-in-transportation.html (lauding Seoul's transit system, which serves a metropolitan area of 25 million people and has over 350 subway stations, total ridership second in the world only to New York City's, and fare readers that allow passengers to enter by flashing smartphones or credit cards).

2

assigned all right and title in the '044 patent to a company related to Smart Systems in November 2004, which then assigned an exclusive license to Smart Systems in June 2011. *Id*. ¶ 26. The '044 patent involves technology that transmits card numbers through "radio frequency" to a "card terminal," which then sends the number data "to a wire-connected computer" that checks against "a black list, to make a decision for issuing an approval of a transaction." R. 42-1, '044 Patent at Abstract. (Aside from one drawing that diagrams a subway turnstile-regulation system, this patent does not appear to be necessarily limited to contactless credit card transactions solely in the mass transit context. *See id*. at Fig. 7.) Defendants do not contend, at least at the pleadings stage, that this particular patent is invalid.

### B. The Challenged '003, '617, '816, and '390 Patents

Defendants do seek judgment as to the remaining four patents. Two of these are entitled "Learning Fare Collection System for Mass Transit," the first issued by the PTO as Patent No. 7,566,003 (the '003 patent) to Smart Systems in July 2009, and the second as Patent No. 7,568,617 (the '617 patent) in August 2009. *Id*. ¶¶ 27, 28. They similarly claim a "bankcard terminal" for gating access to "a first transit system," comprised of: an "interface" for uploading and downloading information from a "processing system"; a "bankcard reader"; a "processor, coupled to the bankcard reader and to the first interface, to receive the bankcard data" and generate a "hash identifier"; "memory" to "hold" a list or set of bankcard records; and a "second interface." R. 42-1, '003 Patent at 14:58-15:14 (Claim 1); R. 42-1, '617 Patent at 11:6-29 (Claim 1). All in all, these claims describe a method for

3

"validating entry" into a transit network, by first "determining whether [a] currently presented bankcard is contained in the [stored set or list] of bankcard records" and then, after so "verifying" the generated identifier, "denying access" if the proffered card is invalid and not in the records. '003 Patent at 15:50-16:6 (Claim 14); '617 Patent at 11:62-12:18 (Claim 13).

The third and fourth patents at issue incorporate the use of slightly more complicated mass transit fares, including recognition of multiple, distinct balances on a single card and time-based tickets familiar to many urban commuters, like weekly and monthly passes. The PTO issued Patent No. 8,505,816 (the '816 patent), entitled "Public Transit System Fare Balance Processor for Multi-Balance Funding," to Smart Systems in August 2009. Am. Compl. ¶ 29. This patent claims a "method of funding transit rides … from a plurality of funding sources," employing a "processor" that stores "a plurality of balance classes" and "fare rules" in memory, receives bankcard identifier data, and then "infer[s] … a resultant fare." R. 42-1, '816 Patent at 25:11-38 (Claim 1). Finally, in March 2014, Smart Systems was issued Patent No. 8,662,390 (the '390 patent), also named "Public Transit System Fare Balance Processor for Multi-Balance Funding." Am. Compl. ¶ 30. This final patent claims a "method of using a bankcard as an identifying token for time-based mass transit fare products, without using writeable memory on the bankcard," accomplished by "processing" a "timepass record" as well as "presentation records" comprising of a "timestamp" and an "identifier." R. 42-1, '390 Patent at 24:42-25:5 (Claim 1).

4

### C. Procedural History

In its amended complaint, filed in January 2015, Smart Systems alleged that the Ventra system infringed its patents, either literally or under the doctrine of equivalents, as Defendants knew about the '044 patent since 2005 and the remaining patents since as early as 2012. *See* Am. Compl. at Counts 1-5. Defendants, for their part, have raised a number of counterclaims, including non-infringement, invalidity of the patents as they assert rights to non-patentable, abstract ideas, as well as attorney's fees and costs. *See* R. 43, Answer at Counterclaims 1-2. Defendants have moved for judgment on the pleadings on the invalidity question as to the four latter patents. R. 50, Mot. J. Pleadings. After reviewing the parties' briefs, the Court requested additional submissions, in particular directing Smart Systems to point to actual claim language from the patents themselves (which was almost entirely missing in its initial memorandum of law) to justify why the patents adequately "cover more than abstract ideas and involve inventive concepts." R. 62, Minute Entry dated May 22, 2015.

### II. Standard of Review

A motion for judgment on the pleadings under Fed. R. Civ. P. 12(c) challenges "the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 678-79.

Patents are presumed to have been validly issued, and a party bringing a Rule 12(c) motion challenging one's validity must point to clear and convincing evidence (in the pleadings themselves) demonstrating that the patent covers ineligible material. *See Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2242 (2011) (extending § 282 of the Patent Act, which lays out assumption of validity and burden of proof, to invalidity defenses); *accord Vehicle Intelligence & Safety LLC v. Mercedes-Benz USA, LLC*, — F.Supp.3d —, —, 2015 WL 394273, at *2 (N.D. Ill. Jan. 29, 2015) (applying standard to motions for judgment on the pleadings). Because courts may consider documents incorporated by reference as well as take judicial notice of matters of public record in evaluating motions for judgment on the pleadings, district courts may look to the contents of the patents themselves without converting a Rule 12 motion into one for summary judgment. *See United States v. Wood*, 925 F.2d 1580, 1581 (7th Cir. 1991); *FM Indus., Inc. v. Citicorp Credit Servs., Inc.*, 2007 WL 4335264, at *4 (N.D. Ill. Dec. 5, 2007).

### III. Analysis

#### A. Standard for Patentability

The Patent Act describes what is patentable: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any

6

new and useful improvement thereof, may obtain a patent therefor[.]" 35 U.S.C. § 101. But it is fundamental that "[l]aws of nature, natural phenomena, and abstract ideas are not patentable." *Association for Molecular Pathology v. Myriad Genetics, Inc.*, 133 S. Ct. 2107, 2116 (2013) (internal quotation marks and alterations omitted). Because they are the "basic tools of scientific and technological work," *id.* at 2116, "monopolization of those tools through the grant of a patent might tend to impede innovation more than it would tend to promote it," *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1293 (2012). *See also Bilski v. Kappos*, 561 U.S. 593, 606 (2010) (Courts must "strik[e] the balance between protecting inventors and not granting monopolies over procedures that others would discover by independent, creative application of general principles.").

Nevertheless, because "all inventions at some level embody, use, reflect, rest upon, or apply … abstract ideas," *id.*, this exclusionary principle cannot be so broad as to make something un-patentable simply because it involves, at some level, an abstract concept, *see Diamond v. Diehr*, 450 U.S. 175, 187 (1981). So long as the concept has been applied to "a new and useful end," transforming the abstract idea into an actual invention, the result may be eligible subject matter for patent protection. *Gottschalk v. Benson*, 409 U.S. 63, 67 (1972).

In *Alice Corp. Pty. v. CLS Bank Int'l*, 134 S. Ct. 2347 (2014), the Supreme Court recently reiterated the two-step analysis for making that determination. First, the reviewing court asks if the claims in question are "directed" to a "patent-ineligible abstract idea" on their face. *Id.* at 2355-56 (internal quotation marks

7

omitted). If so, the court then must ascertain if the claims nonetheless contain an "inventive concept" that can "transform th[e] abstract idea into a patent-eligible invention."[3] *Id.* at 2357. At its heart, the question boils down to whether the patent-seeker claims ownership over a basic "building block of human ingenuity," rather than a novel creation that "integrate[s] the building blocks into something more." *Id.* at 2354 (citation omitted).

### B. Use of Representative Claims

To carry out this analysis, Defendants argue that the Court should evaluate one claim from each of the challenged patents as illustrative of their content: (1) Claim 13 of the '617 patent; (2) Claim 14 of the '003 Patent; (3) Claim 1 of the '816 Patent; and (4) Claim 1 of the '390 patent. R. 52, Def.'s Br. at 4. That approach is appropriate in this case. For the purposes of a § 101 challenge, where a patent's claims are "substantially similar and linked to the same abstract idea," courts may look to representative claims. *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1348 (Fed. Cir. 2014) (quoting district court); *see also Alice*, 134 S. Ct. at 2359-60.

---

[3]This focus on "inventiveness" is one element of the subject-matter test of § 101 (whether an abstract idea can be remade into an appropriately new and useful end), and is *not* the same as a separate inquiry into whether an invention is novel under 35 U.S.C. § 102. *See Diamond*, 450 U.S. at 190 ("The question … of whether a particular invention is novel is wholly apart from whether the invention falls into a category of statutory subject matter."). To illustrate this distinction, consider Galileo's discovery that heavy and light objects fall at the same rate. That concept, at the time Galileo famously dropped two balls from the Leaning Tower of Pisa in 1589 and gained his famous insight, was wholly novel, upending the then-accepted, but incorrect, Aristotelian view that objects fall at different rates relative to their mass. But as *novel* as the discovery was, the idea was, and remains still, an entirely *abstract* idea, a law of nature over which no one may claim a patent.

8

Smart Systems' argument that the claims identified by the Defendants are not representative is unpersuasive. R. 54, Pl.'s Resp. Br. at 8-9. For instance, Smart Systems says that Claim 13 of the '617 patent overlooks distinctive elements named in Claim 1, but all of the concepts described in the latter are included (indeed in fuller detail) in the former. *Compare* '617 Patent at 15:51-16:6 (describing "bankcard terminal" that interacts with a "processing system" and "bankcard reader" to hold identifiable "bankcard records") *with id.* at 14:58-15:14 (same). The Court is satisfied from its review of the patents that the particular claims identified by the Defendants are representative of the patents as a whole because, as will be explained, they are substantially similar and linked to the same abstract idea as the other claims. (Indeed, these specific claims were the ones cited above in the background section of this Opinion as best explaining the scope of the patents and the methods they claim.)

### C. Application of *Alice*

Turning to the merits of the claims, the Defendants argue that the '003, '390, '617, and '816 patents are invalid in that they assert ownership over an abstract idea: "using a bankcard to access mass transit." Defs.'s Br. at 3. The Court agrees, based on the representative claims, that the patents in question do not satisfy subject-matter eligibility under the *Alice* framework.

#### 1. The Patents are Drawn to an Abstract Idea

Although "[t]he Supreme Court has not delimited the precise contours of the 'abstract ideas' category" when it comes to financial-transaction related patents, the

9

Federal Circuit has explained that "claims directed to the mere formation and manipulation of economic relations" are invalid attempts to claim abstract ideas. *Content Extraction*, 776 F.3d at 1347 (citing *Alice*, 134 S. Ct. at 2536-57). Here, despite Smart Systems' efforts to couch them as something more, the contested patents amount to no more than the same.

Stripped of the technical jargon that broadly describe non-inventive elements (*e.g.*, the "interfaces" and "processing systems"), and further shorn of the typically obtuse syntax of patents, the patents here really only cover an abstract concept: paying for a subway or bus ride with a credit card. Yes, the patents expound on the idea, describing how the transit operator should collect bankcard data, recognize certain bankcards, and store that information in memory to fix what Smart Systems characterizes as the "latency" problem (a fancy way of saying that ordinary credit card transactions take a little too long to practicably let riders pay and get through the transit gate without creating a backup sure to infuriate Chicagoans rushing to work). Pl.'s Resp. Br. at 9; R. 67, Pl.'s Supp. Br. at 1 (citing affidavit of a Smart Systems engineer). To defeat latency, the open payment system maintains the appropriate bank records locally, avoiding the lag necessitated by the usual method of requesting authorization from financial institutions, such as through a web interface or even a telephone system. *See, e.g.*, '003 Patent at 16:24-54 (Claims 18-25). But the recent case law has reiterated that whatever bells and whistles may be added, when reduced to their core, "claims directed to the performance of certain financial transactions"—and paying a fare is a financial transaction—must be

categorized "as involving abstract ideas." *Content Extraction*, 776 F.3d at 1347. *See also Alice*, 134 S. Ct. at 2355-57 (use of computer system to exchange financial obligations is attempt to patent abstract financial concept of intermediated settlements); *buySAFE, Inc. v. Google, Inc.,* 765 F.3d 1350, 1355 (Fed. Cir. 2014) (creation of a performance guaranty for commercial transactions made online); *Accenture Global Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1341 (Fed. Cir. 2013) (computerized method for handling tasks in processing insurance claims) (predating *Alice* but applying related, predecessor case *Mayo*).

Smart Systems offers no authority for why a process that simply speeds up its performance, without more (meaning without actually inventing something that makes performance faster), makes the underlying idea of the transaction itself any less abstract. Indeed, in *Content Extraction*, when applying the first step of the *Alice* test, the Federal Circuit held that patents claiming a method comprised of automated teller machines reading and recognizing information on hardcopy documents (like a bank-account check) covered nothing more than an abstract idea. 776 F.3d at 1347. The Federal Circuit noted that, despite the convenience created by the faster method, "collecting data," "recognizing certain data within the collected data set," and "storing that recognized data in a memory"—which is essentially what the Smart Systems' patents claim—were still part and parcel of an "undisputedly well-known" concept. *Id.* ("[B]anks have, for some time, reviewed checks, recognized relevant data such as the amount, account number, and identity of account holder, and stored that information in their records."). Similarly,

merchants (including mass-transit operators) have, for some time, reviewed credit cards, recognized relevant data like the account number and identity of the account holder, and cleared transactions based on stored information (that is, after all, how credit cards work, whether you verify against a cleared list of good account holders remotely or, as Smart Systems' method propounds, locally).

To resist this conclusion, Smart Systems relies on *Trading Technologies Int'l, Inc. v. CQG, Inc.*, 2015 WL 774655 (N.D. Ill. Feb. 24, 2015), but that case is distinguishable. There, the district court upheld patents improving on methods for electronic trading as doing more than "recit[ing] a fundamental economic or longstanding commercial practice." *Id.* at *4 (quoting *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1256 (Fed. Cir. 2014)). Those patents, unlike Smart Systems', went beyond this abstract idea because they allowed for qualitatively different and previously unavailable types of trades to occur, as opposed to merely speeding up the process by manipulating data. *Id.* (describing new ability to take advantage of dynamic pricing). Another district court case pointed to by Smart Systems, *Helios Software, LLC v. SpectorSoft Corp.*, 2014 WL 4796111 (D. Del. Sept. 18, 2014), deals with patents that claim a particular method of monitoring internet data and network access, and the defendant made no attempt to explain how the method was an abstract, fundamental principle, *see id.* at *17. What's more, *Helios Software* also held that, even if the claims did cover abstract ideas, the patents would still be valid because the claims went on to describe how a computer

was necessary to the performance of the method, in a specific (not just faster) way that no human could perform. *See id.*

In sum, because they are drawn to the abstract concept of a fundamental commercial transaction, paying for a fare, the patents at issue are ineligible under the first step of the *Alice* inquiry. Whether the patents are salvageable depends on the second step.

**2. The Patents Do Not Constitute a Sufficiently Inventive Concept**

Under this second step, even if a patent tries to claim an otherwise abstract idea, the claim can be transformed into something patentable if it incorporates an inventive concept, defined by the Supreme Court as "an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Alice*, 134 S. Ct. at 2355 (quoting *Mayo*, 132 S. Ct. at 1294). Smart Systems contends that the patents satisfy this test because of the various computerized elements that, together, help overcome "existing technical problems" (again "latency" as Smart Systems calls it, or the impracticability of waiting for credit card authorization at the turnstile). Pl.'s Resp. Br. at 11-12. But Smart Systems' reliance on the empty language of terminals, interfaces, processors, and memory cannot save the patents.

The crux of the claims' inventiveness, according to Smart Systems, is that the "specified devices and technological components … operate locally at the 'bankcard terminal' for registered cards without requiring 'the transaction to pass through several networks before reaching … the card's issuing bank.'" Pl.'s Supp. Br. at 3-4 (quoting background, rather than actual claim, language of Patents '003 and '617).

13

Despite focusing on the computer terminal and related equipment as innovations, the claims are still "recited too broadly and generically to be considered sufficiently … meaningful applications of their underlying abstract ideas." *DDR Holdings*, 773 F.3d at 1256. Smart Systems does not really explain how these features actually add anything new to the basic function of authorizing a purchase on a credit card. Invoking "various computer hardware elements," which save time by carrying out a validation function on site rather than remotely, does not change the fact that "in substance," the claims are still "directed to nothing more than" running a bankcard sale—that is, "the performance of an abstract business practice." *Id.*; *see also SiRF Tech., Inc. v. Int'l Trade Comm'n*, 601 F.3d 1319, 1333 (Fed. Cir. 2010) ("In order for the addition of a machine to impose a meaningful limit on the scope of a claim, it must play a significant part in permitting the claimed method to be performed, rather than function solely as an obvious mechanism for permitting a solution to be achieved more quickly."). Merely enabling that practice to be carried out in a new setting (and there would be many where open payment adds convenience) with computerized elements is not enough. "[T]he prohibition against patenting abstract ideas 'cannot be circumvented by attempting to limit the use of the [concept] to a particular technological environment.'" *Bilski*, 561 U.S. at 610 (quoting *Diehr*, 450 U.S. at 191-92).

It bears noting too that Smart Systems does not purport to argue that the computer elements described by the claims are in themselves new inventions. Indeed, although their use in the mass transit setting is portrayed as a

methodological breakthrough, the actual technological components are described only in generic terms like "processor," "hash identifier," "identifying token," and "writeable memory," the technical details of which are not described. This is particularly true of the '816 and '319 Patents (ostensibly presenting inventive technology that can read data about time-based fares and multiple balances), which merely puts forth undefined or conventional technical terms like "presentation record," "timepass product," and "storing in memory." *See* Pl.'s Resp. Br. at 11-15 (citing representative claim language). "Wholly generic computer implementation is not generally the sort of additional feature that provides any practical assurance that the process is more than a drafting effort designed to monopolize the abstract idea itself." *Alice*, 134 S. Ct. at 2350-51 (quoting *Mayo*, 132 S. Ct. at 1297). This lack of technical innovation also renders inapposite a case relied on by Smart Systems, *DDR Holdings*. In that case, the Federal Circuit upheld as patentable a system that allows an online shopper to click and view an advertiser's link while remaining on a hybrid display retaining visual elements of the original host website; the key to that patent's survival was that it resolved a "particular internet-centric problem," achieving the features of a new, previously unconceived (and never accomplished) form of webpage. 773 F.3d 1257-59. Smart Systems cannot claim to have analogously "overcome a problem specifically arising in the realm of computer networks." *Id*. at 1257. Rather than having created any technological innovation, it merely seeks to apply existing technology, just in a purportedly inventive combination.

It matters not that, even if the individual elements are not individually innovative, "[n]obody before used [them] all together" in the new setting of mass transit. Pl.'s Supp. Br. at 5 (relying on *Diamond*); Pl.'s Resp. Br. at 1 (urging Court to look at "ordered combination" of claims). It is true, as Smart Systems says, that "a new combination of steps in a process may be patentable even though all the constituents of the combination were well known and in common use before the combination was made." *Diamond*, 450 U.S. at 188 ("[C]laims must be considered as a whole."). But that type of new combination is typically patentable as part of a transformative, manufacturing process: "a mode of treatment of certain materials to produce a given result" that, if sufficiently "reduced to a different state or thing" and "new and useful" can give rise to a patent. *Id.* at 182. Thus, Smart Systems tries to push a diamond-shaped peg through a round hole. *Diamond* spoke of an innovative, and therefore patentable, combination of existing steps that turned raw, synthetic rubber into molded goods. *Id.* at 177-78, 183-84. The methods claimed by Smart Systems do nothing analogous. Smart Systems asserts that its claims "physically transform matter" since the bankcard reader "transforms data on [bankcards] into data the system can use to process." Pl.'s Resp. Br. at 15. Even accepting this rather metaphysical conception of data manipulation as physical transformation, however, note that Smart Systems here suddenly changes the focus from the overall process to one technical piece, the bankcard reader—which standing alone is not the subject of the patents at issue (nor could it be, being preexisting technology). On the whole, there is nothing that the "ordered

16

combination," which is really what Smart Systems leans on, transforms. And although the physical production of a "different state or thing" is merely one way of demonstrating a patentable process, Smart Systems offers no other argument for why its use of its claimed components together is "anything more than" a grouping of "conventional steps" and extant technology. *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 716-17 (Fed. Cir. 2014) (quoting *Bilski*, 561 U.S. at 604) ("[T]he machine-or-transformation test is a useful and important clue, an investigative tool, for determining whether some claimed inventions are processes under § 101. [It] is not the sole test for deciding whether an invention is a patent-eligible 'process.'").

Accordingly, the challenged patents fail to demonstrate the necessary inventiveness to overcome the fact that they are drawn to an invalidly abstract idea. That is not to say that enabling riders to quickly access mass transit using bankcards is not useful. (The speed associated with "contactless" bankcard payment would add convenience not just at the subway station, but across the economy; it should be noted that the validity of the '044 Patent for that underlying radio frequency technology remains unchallenged.) Yet, as the Supreme Court has counseled, "The Information Age … enable[s] the design of protocols for more efficient performance of a vast number of business tasks. If a high enough bar is not set when considering patent applications of this sort, patent examiners and courts could be flooded with claims that would put a chill on creative endeavor and dynamic change." *Bilski*, 561 U.S. at 608. Simply applying the fundamental,

17

abstract concept of paying with a bankcard to the transit context does not clear the bar.

## IV. Conclusion

For the reasons given above, the Defendants' motion for judgment on the pleadings [R. 50] on the invalidity of the '003, '617, '816, and '390 Patents is granted.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: July 10, 2015

18