SMART SYSTEMS INNOVATION, LLC, )
)
              Plaintiff, )     No. 14 C 8053
)
              v. )
)     Judge Edmond E. Chang
CHICAGO TRANSIT AUTHORITY, )
CUBIC CORPORATION, CUBIC )
TRANSPORTATION SYSTEMS, INC., and )
CUBIC TRANSPORTATION SYSTEMS )
CHICAGO, INC. )
)
            Defendants. )

## MEMORANDUM OPINION AND ORDER

Plaintiff Smart Systems Innovation, LLC sued Defendants Chicago Transit Authority (CTA), Cubic Corporation, Cubic Transportation Systems, Inc., and Cubic Transportation Systems Chicago, Inc. for infringing U.S. Patent No. 5,828,044 (the '044 patent), which covers a non-contacting type radio frequency recognizing credit card system.[1] R. 42, First Am. Compl.[2] Smart Systems alleges that the CTA's "Ventra" transit-fare collection system, which the remaining defendants helped the CTA implement, infringes the '044 patent. *Id.* ¶¶ 31-37. The parties have briefed the construction of the patent's disputed claims and the Court held a claim

---

[1] Smart Systems also alleged that Defendants infringed four of its other patents. R. 42, First Am. Compl. The Court, however, already held those other patents invalid. R. 81, July 2015 Order. So the only remaining patent at issue is the '044 patent.

[2] Citations to the docket are noted as "R." followed by the docket entry number.

construction hearing on December 2, 2015. The Court's construction of the claim terms at issue is set forth below.[3]

In addition to disputing the meaning of certain claims, the parties also fight over whether the '044 patent's use of the term "several" is indefinite. R. 92, Defs.'s Br. at 22; R. 98, Pl.'s Resp. Br. at 17. As explained in a prior order [R. 116], that dispute must wait, because the Court reopened discovery on the limited issue of how a skilled artisan would have understood the term "several" in the context of the '044 patent, something neither party addressed in their briefing or at the hearing. But the construction of the disputed claims is ready to decide.

## I. Background

The CTA began operating its current Ventra card system in early 2014. R. 42, Am. Compl. ¶ 14. The Ventra card system allows people to board subways and buses by simply "tapping" fare-readers with their Ventra card, which is a "contactless" card loaded with transit funds that can also function as a bank account-linked debit card. *Id.* ¶¶ 13-14. Smart Systems alleges that the CTA's Ventra card system infringes the '044 patent, which covers the "open payment" system on which Ventra is allegedly based. *Id.* ¶¶ 31-37.

An open-payment fare system enables riders to quickly and easily access mass transit by using existing bankcards. *Id.* ¶ 10; Pl.'s Resp. Br. at 1. Open-payment systems eliminate the need for, and added operational cost of, dedicated fare-cards. Am. Compl. ¶ 10. They also allow transit agencies to use the already-established credit card authorization network, rather than having to create their

---

[3]The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1338.

own in-house network. *Id.*; Pl.'s Resp. Br. at 1. Smart Systems contends that it was "an early developer of open payment technologies for public transit" in the United States. Am. Compl. ¶ 10. After observing the successful implementation of the technology in Seoul, South Korea, Smart Systems sought to replicate that success in the United States. *Id.* ¶ 11. Smart Systems initially partnered with a Korean company—the original owner of the '044 patent—to promote the technology, but then began marketing the technology to transit agencies in the United States on its own after one of its affiliates acquired the patent. *Id.*; Pl.'s Resp. Br. at 1.

## A. The '044 Patent

The '044 patent, entitled "Non-contacting Type Radio Frequency Recognizing Credit Card System," was originally issued in October 1998 by the United States Patent and Trademark Office (PTO) to the Korean-based firm, Kookmin Credit Card Co., Ltd. *See* Joint Appendix (J.A.), Exh. A at 1, '044 Patent; Am. Compl. ¶¶ 24, 26. Kookmin assigned all rights and title in the '044 patent to an affiliate of Smart Systems in November 2004, which then assigned an exclusive license to Smart Systems in June 2011. *Id.* ¶ 26. The '044 patent describes a non-contacting credit-card system that uses a batteryless, radio-frequency (RF) card for a transaction. J.A., Exh. A at 1, '044 Patent. The system includes a card terminal, which receives the RF card's number data via a radio frequency, so there is no need to insert the card into a reader. *Id.* at 8 (Col. 2, Lines 5-10; Col. 2, Lines 30-35). In turn, the card terminal sends the card number data to a wire-connected terminal computer. *Id.* (Col. 2, Lines 35-40). The terminal computer then checks the card

number against a periodically-updated "blacklist" to determine whether to approve (or disapprove) the transaction. *Id.* (Col. 2, Lines 40-45). If the card number does not appear on the blacklist, then the transaction is approved. *Id.* The independent claims at issue—Claims 1, 6 and 46—reflect various differences from this general description (which is essentially Claim 1), including whether the transaction is specific to a transit system (Claim 6), or a bus (Claim 46), or to a 16-digit credit-card number (also Claim 46). J.A., Exh. B at 2-3, Reexam. Certificate '044 Patent (Col. 1, Lines 25-45; Col. 2, Lines 1-20; Col. 4, Lines 38-63). Claims 1 through 5 were included in the original patent. J.A., Exh. A at 11, '044 Patent (Col. 1, Lines 60-65; Col. 2, Lines 1-15). Claims 6 through 46 were added when the patent was reexamined by the PTO. J.A., Exh. B at 2-3, Reexam. Certificate '044 Patent (Col. 1, Lines 25-45; Col. 2, Lines 1-20; Col. 4, Lines 38-63). The reexamination history is described below. *See generally* J.A., Exh. D. The asserted benefits of the '044 patent include: a drastic reduction in the amount of time it takes to read a transit card, the elimination of batteries in transit cards, the ability to include an advanced payment function as part of the RF card so that services can be provided off-line, and the ability for part of the RF card's memory to function as a debit card system so that users may have an instant payment function. J.A., Exh. A at 8, '044 Patent (Col. 2; Lines 1-30).

### B. Reexamination of the '044 Patent

In November 2007, the PTO granted a request for an *ex parte* reexamination of the '044 patent. Am. Compl. ¶ 25; J.A., Exh. D at 117. During its reexamination,

the PTO preliminarily rejected all five of the '044 patent's original claims (Claims 1 through 5) based on a finding of obviousness. J.A., Exh. D at 75-89; *see* 35 U.S.C. § 103(a) (describing obviousness standard). In reaching this conclusion, the Examiner noted several similarities between the '044 patent and the prior art. For example, the Examiner noted that U.S. Patent No. 5,286,955 ("Klosa patent") similarly "discloses a wireless, i.e. non-contacting, transmission system for transmitting data to/from a[n] IC chip such as a credit card," and that "[t]he system operates at high-frequency, … which is part of the RF spectrum." J.A., Exh. D at 78. The Examiner further noted that U.S. Patent Nos. 5,396,558 ("Ishiguro patent") and 5,191,193 ("Le Roux patent"), as well as European Patent Application EP 0 254 596 ("EP 595 patent"), also describe using a "black list" to "make a decision as to whether to approve a transaction." *Id.* at 80-81. Based on these findings, the Examiner preliminarily concluded that the '044 patent was invalid as obvious.

Before responding to the PTO's preliminary rejection, Smart Systems first requested that Claims 1 through 5 be amended "to correct obvious typographical errors" and that new Claims 6 through 46 be added to the patent. *Id.* at 39, 51. Smart Systems then put forth several arguments for why the subject matter of the '044 patent was not obvious at the time of the patent application. It argued that the Klosa patent, unlike the '044 patent, did not disclose a credit card:

> [The Klosa patent] recites "the familiar credit cards **for cash dispensing machines**" (Klosa at column 1, lines 12-13). Read in context, such cards "for cash dispensing machines," while sharing their form factor with credit cards, are familiarly known as ATM cards (Automatic Teller Machine cards) and not credit cards as provided in the '044 patent. As such, Klosa does not disclose a credit card as recited in the claims.

*Id.* at 52 (emphasis in original). Smart Systems also argued that none of the other pre-existing patents referenced by the Examiner (for example, the Klosa patent, Ishiguro patent, Le Roux patent, or EP 595 patent) disclose the "[transmission of] a 'card number … by radio frequency' as recited in the independent claims" in the '044 patent. *Id.* at 52-54. And finally, Smart Systems reiterated that "the claim language 'card number' in light of the specification means a 'credit card number,' … and not an IC chip serial number," as in the Klosa patent. *Id.* at 59.

After hearing Smart Systems' arguments, the PTO permitted the claims—both old (Claims 1 through 5) and new (Claims 6 through 46)—to issue. *See* J.A., Exh. B, Reexam. Certificate '044 Patent; J.A., Exh. D at 9. The PTO agreed that "none of the prior art of record discloses or suggests a contactless RF card that transmits a *credit card number* via radio frequency." *Id.* (emphasis added). The PTO explained that the prior art did refer to the "transmission of data generally," but that it did not specifically reference the transmission of "a credit card number," and that, as a result, the "wireless transmission of a credit card number" could not be deemed obvious at the time of the '044 patent's application. *Id.* The PTO further noted that it "agree[d] with the patent owner's interpretation of 'card number,'" which when read "in the context of the ['044 patent's] specification and … each claim" is "clear[ly] … referring to a credit card number, rather than some other number such as for example a serial number of the IC chip in the card." *Id.* at 10. After making these findings, the PTO then issued a reexamination certificate for the '044 patent in September 2008. J.A., Exh. B, Reexam. Certificate '044 Patent.

## C. Disputed Terms

The parties have identified several disputed terms for construction in the '044 patent, all of which can be found in Independent Claims 1, 6 and 46. The claim language for each of those independent claims (which are very similar) is detailed below and the disputed terms are emphasized (in bold italics). Some of the disputed terms are referenced multiple times in the claims (for example, "card number" and "credit card number"), and in several instances, the disputed terms refer to entire clauses (for example, "an antenna coil wound around the inner edges of said RF card within said card several times and an IC disposed within said antenna coil").

Claim 1 states:

> 1. A non-contacting type radio frequency recognizing ***credit card system*** comprising:

> a batteryless type RF card having ***an antenna coil wound around the inner edges of said RF card within said card several times and an IC disposed within said antenna coil***, and being energized by received radio wave from a card terminal so as to transmit its own ***card number*** to said card terminal by a radio frequency;

> said card terminal radiating a radio wave to generate an induced electromotive force in said RF card, receiving said ***card number data*** by RF, and transmitting the ***card number data***, received through a radio frequency, to a ***wire-connected terminal computer*** for an inquiry to a black list; and

> ***said terminal computer reading the card number data from said card terminal to make an inquiry to a black list which is updated from a central computer periodically or intermittently, to make a decision for issuing an approval of a transaction or a disapproval of the transaction, and to transmit the result of the decision to said card terminal***.

J.A., Exh. B at 2, Reexam. Certificate '044 Patent. Claim 6 states:

6. A non-contacting type radio frequency recognizing **credit card system** comprising:

a batteryless type RF card having **an antenna coil wound around the inner edges of said RF card within said card several times and an IC disposed within said antenna coil**, and being energized by received radio wave from a card terminal so as to transmit a **credit card number** to said card terminal by a radio frequency;

said card terminal, in a transit system, radiating a radio wave to generate an induced electromotive force in said RF card, receiving said **credit card number** by RF, and transmitting the **credit card number**, received through a radio frequency, to a **wire-connected terminal computer** for an inquiry to a black list; and

**said terminal computer reading the credit card number from said card terminal to make an inquiry to a black list which is updated from a central computer periodically or intermittently, to make a decision for issuing an approval of a transaction or a disapproval of the transaction, and to transmit the result of the decision to said card terminal**.

*Id.* Finally, Claim 46 states:

46. A non-contacting type radio frequency recognizing **credit card system** comprising:

a batteryless type RF card having **an antenna coil wound around the inner edges of said RF card within said card several times and an IC disposed within said antenna coil**, and being energized by received radio wave from a card terminal so as to transmit a **credit card number** comprising 16 numerals to said card terminal by a radio frequency;

said card terminal, in a bus, radiating a radio wave to generate an induced electromotive force in said RF card, receiving said **credit card number** by RF, and transmitting the **credit card number**, received through a radio frequency, to a **wire-connected terminal computer** for an inquiry to a black list; and

**said terminal computer reading the credit card number from said card terminal to make an inquiry to a black list which is updated from a central computer periodically or intermittently, to make a decision for issuing an approval of a transaction or a**

***disapproval of the transaction, and to transmit the result of the
decision to said card terminal***;

> wherein said terminal computer makes the decision for issuing the approval
> or the disapproval immediately following the inquiry to the black list.

*Id.* at 3.

## II. Legal Standard

To construe a patent claim, a court "first look[s] to, and primarily [relies] on, the intrinsic evidence," which "includ[es] the claims themselves, the specification, and the prosecution history of the patent." *Sunovion Pharms., Inc. v. Teva Pharms. USA, Inc.*, 731 F.3d 1271, 1276 (Fed. Cir. 2013). When analyzing the intrinsic evidence, the Court begins with the language of the claims themselves, applying a "heavy presumption" that claim terms take on their ordinary meaning as viewed by one of ordinary skill in the art. *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1369 (Fed. Cir. 2003). A claim term takes on its ordinary meaning unless the patentee demonstrates an intent to deviate from that meaning, such as by "act[ing] as his own lexicographer," or by "disavow[ing] the full scope of a claim term either in the specification or during prosecution." *Starhome GmbH v. AT&T Mobility LLC*, 743 F.3d 849, 856 (Fed. Cir. 2014).

"In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996). In such cases, "it is improper to rely on extrinsic evidence." *Id.* Extrinsic evidence, however, may be considered, "if needed to assist in determining the meaning or scope of technical terms in the claims." *Pall Corp. v.*

*Micron Separations, Inc.*, 66 F.3d 1211, 1216 (Fed. Cir. 1995). In other words, extrinsic evidence, such as expert testimony, may be consulted to ensure that the court's construction of a claim "is not inconsistent with clearly expressed, plainly apposite and widely held understandings in the pertinent technical field." *Plant Genetic Sys., N.V. v. DeKalb Genetics Corp.*, 315 F.3d 1335, 1346 (Fed. Cir. 2003). Extrinsic evidence in general, however, is considered "less reliable than the patent and its prosecution history in determining how to read claim terms." *SkinMedica, Inc. v. Histogen Inc.*, 727 F.3d 1187, 1195 (Fed. Cir. 2013).

## III. Analysis

### A. Credit Card

The first dispute is over the meaning of the claim term "credit card." Defendants propose construing "credit card" as "a card linked to a financial institution account allowing purchases on credit." R. 92, Defs.'s Br. at 7. Smart Systems proposes construing the term as "a card linked to an account allowing for purchases on credit processed through a commercial network providing authorization, clearance and settlement of transactions." R. 98, Pl.'s Resp. Br. at 8. For the following reasons, the Court rejects both proposed constructions, and instead construes "credit card" to mean a card allowing purchases on credit.

Defendants' proposed construction is incorrect because it adds an unstated limitation: that the card must be linked to a "financial institution." Nowhere in the '044 patent is the term "financial institution" used; instead, the patent uses the term "credit card managing company" to describe the institution associated with the

credit card. J.A., Exh. A at 8, '044 Patent (Col. 1, Lines 16, 46). Nevertheless, Defendants argue that their proposed construction is supported by the prosecution history. Defs.'s Br. at 8. Specifically, they point to an expert declaration that Smart Systems submitted during reexamination as support for Smart Systems' contention that the '044 patent's claims were not invalid for obviousness. *Id.*; J.A., Exh. D. at 60-64. In that report, Smart Systems' expert states that, at the time the '044 patent was filed, the "transmission of credit card numbers by contactless smart cards" was not obvious, in part, because "[f]inancial institutions, the sole issuers of credit cards, showed no interest in applying contactless smart card technology to credit cards." J.A., Exh. D. at 64. Defendants contend that in making this representation to the Patent Office, Smart Systems limited the '044 patent's claims to cards that are "linked to a financial institution account." Defs.'s Br. at 8.

But this expert statement falls well short of a clear and unmistakable disclaimer of claim scope. *Invitrogen Corp. v. Biocrest Mfg. L.P.*, 327 F.3d 1364, 1367 (Fed. Cir. 2003) (explaining that a disclaimer made during the prosecution of a patent must be "clear[]" and "unambiguous[]" before it can be used to limit the scope of a claim); *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1325 (Fed. Cir. 2003) (explaining that, in order to constitute a claim limitation, a disclaimer must "be both so clear as to show reasonable clarity and deliberateness, and so unmistakable as to be unambiguous evidence of disclaimer"); *Rowe Int'l Corp. v. Ecast, Inc.*, 500 F. Supp. 2d 891, 903-04 (N.D. Ill. 2007). When Smart Systems' expert made this statement, he was not disclaiming all credit cards not linked to a financial

institution. He was merely stating that part of why the transmission of credit card numbers was not obvious at the time of the '044 patent's application was because transit agencies were using "closed, stored value systems" and financial institutions, the issuers of credit cards, "showed no interest in applying contactless smart card technology to credit cards." J.A., Exh. D at 64. His reference to financial institutions as being the "sole" issuers of credit cards was made in passing. The point the expert was trying to make there was that credit cards were not being used by transit agencies, instead, *stored value* cards were being used, which transmitted card ID numbers and not credit card numbers. So the expert was distinguishing the '044 patent based on the *type* of card used (credit card versus stored value card) and the data transmitted (credit card number versus card identification number), not based on the institution (financial or otherwise) associated with the account. Smart Systems repeatedly made this same argument throughout reexamination, asserting that what makes the '044 patent unique (and not obvious) is that it discloses the use of a credit card and the transmission of a credit card number, and not an ATM card that transmits "data" like in the Klosa patent, an IC card that transmits a "card identification number" like in the Ishiguro patent, or a memory card like in the Le Roux patent. J.A., Exh. D at 52-53. Thus, the expert's passing remark about "financial institutions" does not constitute a clear disavowal of claim coverage. *York Prods., Inc. v. Cent. Tractor Farm & Family Ctr.*, 99 F.3d 1568, 1575 (Fed. Cir. 1996) ("Unless altering claim language to escape an examiner rejection, a patent

applicant only limits claims during prosecution by clearly disavowing claim coverage.").

A separate problem posed by the addition of "financial institution" is that the term itself would need to be further defined. Contrary to Defendants' contention, the meaning of "financial institution" is not so clear that a jury could "easily determine what is or is not a 'financial institution.'" Defs.'s Reply Br. at 4. Federal law defines the term differently in different contexts. C*ompare* 31 U.S.C. § 5312(a)(2) (Bank Secrecy Act), *with* 18 U.S.C. § 20 (federal criminal code). And, in certain contexts, the term is held to encompass entities that one would not traditionally think of as being financial institutions, such as casinos, pawnbrokers, and travel agencies. *E.g.*, 31 U.S.C. § 5312(a)(2) (including in its definition of "financial institution" casinos, travel agencies, persons involved in real estate closings and settlements, the United States Postal Service, and pawnbrokers). The purpose of construing claims is to help clarify the scope of the claims, not to add further confusion. *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) (explaining that the purpose of claim construction is "to clarify and when necessary to explain what the patentee covered by the claims"). The addition of "financial institution" into the definition of "credit card" would not provide clarity.

As for Smart Systems' proposed construction, that too misses the mark. Smart Systems argues that a "jury would benefit from the [added] explanation that a credit card is 'processed through a commercial network providing authorization, clearance and settlement of transactions.'" Pl.'s Resp. Br. at 10. But this additional

language is fraught with obscurity and the need for yet more definition. What is "a commercial network"? And why would adding that phrase help the jury? Nor does this language appear anywhere in the specification or prosecution history. Because the language fails to clarify the meaning of "credit card," the Court rejects it.

Finally, the Court rejects the use of the word "linked" in the construction of this claim term. Both parties employ this word in their proposed constructions. But the term is not used in the patent, nor is its meaning readily apparent. It would, in all likelihood, require further clarification. Thus, the Court will not use it here.

Having rejected the constructions proposed by the parties, the Court now adopts the following construction: a "credit card" is a card allowing purchases on credit. This definition is derived from the term's ordinary meaning, *see, e.g.*, Credit Card, Oxford English Dictionary, http://www.oed.com (last visited Dec. 17, 2015) ("A card issued by an organization authorizing a named person to draw on its account or to make purchases on credit."), and eliminates any potential confusion that might spring from a construction that requires the card to be "linked" to a particular type of account or institution. Nothing in the intrinsic evidence suggests that the card must be linked to a particular type of account or institution, and therefore, there is no reason to deviate from the term's ordinary meaning. Accordingly, the Court construes "credit card" to mean a card allowing purchases on credit.

### B. Card Number, Card Number Data, and Credit Card Number

The parties next dispute the claim terms "card number," "card number data," and "credit card number." The parties generally agree that these three claim terms

should be given the same meaning, because they are used as synonyms in the '044 patent, *see* Defs.'s Br. at 12; Pl.'s Resp. Br. at 16, but the parties disagree over what that construction should be. Smart Systems proposes construing the terms to mean "data identifying the account associated with a credit card." Pl.'s Resp. Br. at 12, 16. Defendants propose construing the terms to mean "the account number on the face of the credit card." Defs.'s Br. at 10, 12. The Court again rejects both proposed constructions.

At the claim construction hearing, Defendants stated that they included the verbiage "on the face of the credit card" in their proposed construction because that is how "card number" is illustrated in one of the patent's drawings. It is true that the specification includes a figure of a credit card which displays a 16-digit card number on the front of the card—where one would typically find a credit card number. J.A., Exh. A at 2, '044 Patent (Fig. 1A). But that figure is merely meant to illustrate how "the frontal face and the rear face of the *usual* credit card" look. *Id.* at 8 (Col. 2, Lines 53-54) (emphasis added). The patent language in no way suggests (nor does the prosecution history) that this is the only place a credit card number might be found or stored. Accordingly, the Court rejects Defendants' proposed construction, which would require that the account number be on the face of the credit card.

As mentioned above, Smart Systems proposes to define the terms as "data identifying the account associated with a credit card." Pl.'s Resp. Br. at 12, 16. Smart Systems argues that the '044 patent specification suggests that the term

"credit card number" is meant to encompass more than just the 16 digits found on the front of the card. *Id.* at 12-13. According to Smart Systems, the specification also discloses other possible implementations of a credit card number. *Id.* at 13. For example, it describes how a conventional credit card is equipped with a rear-facing magnetic strip, which stores the "paying passbook account number" and "[t]he data for judging the authenticity of the credit card holder," *id.* (citing J.A., Exh A at 8, '044 Patent (Col. 1, Lines 22-25), and it explains how it is the "electronic representation" of a card's number that is relevant, because the card terminal does not read the numbers printed on the front of the card but rather the "data coded in an integrated circuit placed on the card and transmitted through an antenna," *id.* at 14 (citing J.A., Exh. A at 10, '044 Patent (Col. 5, Lines 44-50)). According to Smart Systems, these other possible implementations show that "credit card number," "card number," and "card number data" collectively refer to any "data identifying the account associated with a credit card." *Id.* at 15.

Smart Systems makes some fair points, but its proposed construction is still too broad. It is true that the '044 patent discloses the transmittal of the credit card number in electronic form. The specification explains that the RF card's integrated circuit "modulates the card number data," and "transmits the modulated data through the antenna coil … to the card terminal," which then "transmits the received card number data to the terminal computer." J.A., Exh. A at 10, '044 Patent (Col. 4, Lines 44-56). So the specification makes clear that the system relies

on data coded in an integrated circuit placed on the RF card, and not on visual observation of the face of the credit card or anything like that.

That argument makes sense insofar as the number need not appear on the *face* of the card—but "data identifying the account" goes too far. The intrinsic evidence shows that the transmitted data can only be referring to the *credit card* number, and not to some other data that might be used to identify the card's account, which Smart Systems' proposed construction would allow. Specifically, during reexamination, Smart Systems repeatedly told the Examiner that what distinguishes the '044 patent from the prior art is the patent's reliance on and transmission of a *credit card* number, and not some other data or number, such as an IC chip serial number. J.A., Exh. D at 52 ("It is not seen where any of the references cited by the Examiner discloses the feature to transmit a '*card* number … by a radio frequency' as recited in the ['044 patent's] independent claims." (emphasis added)). It is this distinction that the PTO found persuasive, and on which the PTO based its decision to issue a reexamination certificate:

> As indicated in the [patentee's] Response, … none of the prior art of record discloses or suggests a contactless RF card that transmits a credit card number via radio frequency; *the references suggest transmission of data generally, but not specifically a credit card number*. There is no disclosure of wireless transmission of a credit card number, therefore the limitation cannot be deemed obvious.

*Id.* at 9-10 (Statement of Reasons for Patentability and/or Confirmation) (emphasis added). Smart Systems cannot now take the more expansive position that what the patent discloses is the transmission of *any* data identifying the account. Doing so would render meaningless the limitation drawn in the prosecution history. *Cat Tech*

*LLC v. TubeMaster, Inc.*, 528 F.3d 871, 885 (Fed. Cir. 2008) (rejecting a proposed construction because it would render a claim limitation meaningless). It is possible for data other than a credit card number to be used to identify a credit card holder's account. For example, a person's social security number, address, or even just their name could potentially be used to identify their account. But no reasonable interpretation of "credit card number" would encompass the transmission of this other data, even if it could identify the card holder's account number. Both the Examiner and Smart Systems were clear during reexamination: what makes the '044 patent patentable is the fact that it transmits a *credit card number*, and *not* some other data identifying the account. Accordingly, the Court rejects Smart Systems' proposed construction, which would allow any data identifying the account to be encompassed within the definition of card number.

Having reviewed the intrinsic evidence in its totality, the Court instead concludes that the claim terms "credit card number," "card number," and "card number data" must be construed to mean the number on the credit card account. That number need not be comprised of the typical 16 Arabic numerals, nor does it need to be found on the face of the credit card. But the claims do require that the number on the credit card account be the data transmitted to the card terminal. J.A., Exh. D at 54 ("[N]one of the [prior art] references disclose wirelessly transmitting a credit card number … .").

## C. Credit Card System

The next disputed claim term is "credit card system." Defendants argue that this term does not need a construction. Defs.'s Br. at 14. They note that the term is found only in the preambles of the independent claims, and argue that, as a result, any universal construction of "credit card system" would be imprecise because each claim defines the term in a different way. *Id.* Smart Systems, in contrast, asserts that a construction is necessary because the '044 patent is, in essence, a credit card system. Pl.'s Resp. Br. at 8. And because the '044 patent is about a credit card system, Smart System argues, it would be useful to have the term explained to the trier of fact. Thus, Smart Systems proposes construing the term as "a system enabled to accept and facilitate the processing of credit cards." *Id.*

But Smart Systems' argument is flawed for two reasons. First, the term "credit card system" is not a term in and of itself. It appears only in the preambles, and does not operate to limit the independent claims. It is true that "[i]f a preamble recites essential structure or steps, or if it is necessary to give life, meaning, and vitality to the claim, then the preamble can limit the scope of a claim." *TomTom, Inc. v. Adolph*, 790 F.3d 1315, 1323 (Fed. Cir. 2015) (internal quotation marks and citations omitted). But the preambles of the pertinent claims do not do that. In each independent claim, the text in the body of each of the claims provides "a structurally complete invention." *Id.* Nor is the preamble otherwise necessary to give meaning to the claims themselves.

The second problem with Smart Systems' argument, and more specifically, its proposed construction, is that it misconstrues the patent. The '044 patent is about a

system that recognizes credit cards. During reexamination, Smart Systems repeatedly distinguished the '044 patent on the ground that it recognizes not just any card, but a credit card. *See* J.A., Exh. D at 59 ("[N]one of the prior art references disclosed a credit card that wirelessly transmitted a credit card number as recited in the claims"); *id.* ("Klosa does not disclose a credit card *per se*"); *id.* at 52 ("Klosa, when read in context, does not disclose a credit card"). Smart Systems also consistently reiterated, and the Examiner found persuasive, that it is the transmission of the credit card number that makes the invention non-obvious. J.A., Exh. D at 9 ("As indicated in the [patentee's] Response … none of the prior art of record discloses or suggests a contactless RF card that transmits a credit card number via radio frequency; the references suggest transmission of data generally, but not specifically a credit card number."). In making these arguments to the Patent Office, Smart Systems declared that what distinguishes the '044 patent from the prior art is its use of a credit card, and its ability to recognize and compare that card's number against a black list for approval or disapproval. Smart Systems' proposed construction of "credit card system" dilutes this distinction, and suggests that while the system must accept credit cards, it can also accept other cards. But that is not what Smart Systems argued was patentable before the Examiner during reexamination. Accordingly, a construction of "credit card system" is unnecessary and would be inconsistent with the intrinsic evidence.

**D. Antenna Coil Wound Around the Inner Edges of the RF Card**

The parties next dispute the phrase: "an antenna coil wound around the inner edges of said RF card within said card several times and an IC disposed within said antenna coil." Defendants propose construing this term as "an antenna coil wound around the entire periphery of said RF card within said card several times and an IC disposed within said antenna coil." Defs.'s Br. at 15. Smart Systems proposes construing the term as "an antenna coil wound two or more times within the inner edges of the radio frequency ('RF') card with an integrated circuit ('IC') disposed within the antenna coil." Pl.'s Resp. Br. at 17.

As can be gleaned from the parties' proposed constructions, the primary dispute here relates to whether the antenna coil must be wrapped *around* the entire periphery of the card or simply anywhere *within* it. The litigation record presented by the parties does not make clear how a skilled artisan would have understood this term at the time of the patent application, or whether there might be a technological difference between winding an antenna coil "around" the edges of the RF card or simply anywhere "within" it. It is possible that there is no technological difference in where the coil is wrapped within the card. But the specification at least suggests that there might be: "The effective distance between the RF card and the card terminal … within which power can be effectively supplied [to the RF card] is variable depending on the shape of the antenna coil." J.A., Exh. A at 10, '044 Patent (Col. 4, Lines 34-36). At the claim construction hearing, the Court raised the prospect of requiring additional discovery (in particular, in order to obtain skilled-

artisan evidence) to hash out the importance (or not) of where and how the antenna coil is located within the RF card. But given the strong intrinsic evidence of the term's meaning (discussed next), the Court has decided that it is not necessary to reopen discovery on this particular issue or to further delay claim construction on this term.

Defendants point to both the patent language itself and the prosecution history to support their contention that the coil must be wrapped around the entire periphery of the RF card. Defs.'s Br. at 15-17. As a premise of the argument about the patent's wording, Defendants first note that the '044 patent discloses two alternative configurations for the arrangement of an antenna coil on a contactless RF card, as shown in Figures 3 and 4 below. *Id.* at 15-16.



Defendants contend that "[t]he language of the asserted claims mirrors the description of Figure 4 from the specification, indicating that this second configuration is what is claimed in the asserted claims." *Id.* at 16. Defendants also assert that the prosecution history supports this conclusion, because the Examiner

recognized that the '044 patent is embodied in Figure 4, and not in Figure 3. *Id.* (citing J.A., Exh. D at 77).

A review of the intrinsic evidence of the '044 patent shows that Defendants are correct: the patent discloses only an antenna coil wrapped around the edges of the RF card, and not a coil wrapped anywhere within the inner edges of the card. First and foremost, this construction is supported by the claim language itself, which states that the "antenna coil is wound around the inner edges of [the] RF card," with "an IC disposed [of] within [the] antenna coil." J.A., Exh. B at 2, Reexam. Certificate '044 Patent (Col. 1, Lines 26-29). It is also the only construction supported by the prosecution history. When reexamining the '044 patent, the Examiner explicitly recognized that the '044 patent's independent claims are embodied in Figure 4 and not Figure 3:

> Each of the independent claims requires "a batteryless type RF card having an antenna coil wound around the inner edges of said RF card within said card several times and an IC disposed within said antenna coil." This *embodiment is shown in Fig. 4* of the '044 patent, where coil 60 is wrapped around the edges of the card with IC 50 disposed within the coil. This is *opposed to Fig. 3*, which shows coil 60 wound inside the card, but not around the edges, with IC 50 disposed outside the coil.

J.A., Exh. D at 77 (emphases added). The Examiner identified two key differences between the two figures: where the coil was wrapped within the RF card, whether it was around the edges or somewhere within it; and where the integrated circuit was disposed of, whether it was disposed of within the coil or outside of it. While the Examiner made this observation as part of his preliminary findings, Smart Systems never contested the Examiner's finding, nor did it challenge the distinctions the Examiner drew between Figures 3 and 4. Smart Systems' decision not to challenge

the Examiner's finding affects the correct interpretation and scope of this claim term. *TorPharm Inc. v. Ranbaxy Pharms., Inc.*, 336 F.3d 1322, 1330 (Fed. Cir. 2003) ("Whether the patentee chooses to dispute the examiner's view of matters is relevant to claim interpretation, for there a court may need to ascertain exactly what subject matter was actually examined and allowed by the PTO."). By not contesting the Examiner's observation, Smart Systems essentially conceded that the orientation disclosed by Figure 3, where the coil is wrapped *within* the edges of the RF card but not *around* the edges, and where the integrated circuit is disposed of outside the coil, is not disclosed by the '044 patent. Put another way, by letting "the examiner's restrictive interpretation of a claim … stand," Smart Systems "acquiesce[d] to the examiner's narrow view of patentable subject matter [and] abandon[ed] … the rest." *Id.*

Smart Systems tries to avoid this result by arguing that "the most significant difference between Figures 3 and 4 is that in Figure 3, the IC is outside of the antenna winding and in Figure 4 the IC is inside of the antenna winding." Pl.'s Resp. Br. at 19. According to Smart Systems, "[t]here is nothing to suggest that the claim must be limited by every detail of Figure 4." *Id.* But while this may be true, the Examiner was clear in his observation that at least as to the distinctions drawn between the figures regarding the location of the integrated circuit and the location of the coils, those two distinctions did matter and did limit the claims. Again, had Smart Systems wished to challenge the Examiner's observation that the '044 patent is embodied in Figure 4 and not Figure 3, it could have done so; it did not.

Smart Systems also contends that Figure 4 does not support an interpretation that requires the coil to be wrapped around the *entire* periphery of the RF card because "[a]t most Figure 4 can be interpreted to show that the antenna is at the periphery on *three* sides of the card." Pl.'s Resp. Br. at 18 (emphasis added). The premise of this argument is that the rendering of the peeled-back surface of the card (for reference, Figure 4 appears a few pages earlier in this Opinion) literally obscures from view the fourth edge. This argument lacks credibility. No one viewing Figure 4—skilled artisan or otherwise—would conclude that the antenna coil only resides at the periphery on three sides of the card, and does not extend around all four edges of the card. In the specification, Figure 4 is described as having the antenna coil "wound around the inner edges of the card several times," with "the IC … disposed somewhere within the antenna coil." The only plausible interpretation of this description is that the antenna coil is wrapped around all four edges of the card, not just three.

Accordingly, the Court adopts Defendants' "entire periphery" language and construes this term as follows: "an antenna coil wound around the entire periphery of the radio frequency ('RF') card with an integrated circuit ('IC') disposed within the antenna coil."

### E. Wire-Connected Terminal Computer

The parties next dispute the construction of the term "wire-connected terminal computer." Defendants propose construing the term as a "stand-alone computer connected by wire to a separate card terminal." Defs.'s Br. at 18. Smart

Systems asserts that no construction is necessary. Pl.'s Resp. Br. at 22. The Court agrees with the defense that the term does need to be construed, but adopts a modified construction.

At the outset, the Court concludes—and the parties really do not dispute—that the terminal computer is a separate element of the claim. The specification discloses that "the system of the present invention includes an RF card 40, a card terminal 70 and a terminal computer 80." J.A., Exh. A at 9, '044 Patent (Col. 3, Lines 9-10). All three of those terms (RF card, card terminal, and terminal computer) are clearly identified as separate components. And Figure 2, which the specification says represents a "schematic view" of the "present invention," *id.* (Col. 3, Lines 7-8), likewise shows the terminal computer as a separate and distinct element (see below).



FIG. 2

*Id.* at 3.

So the terminal computer is a separate element. But that does not necessarily require that the terminal computer be a "stand-alone" computer as Defendants contend. The term "stand-alone" is itself not clear in meaning, and has the potential

to confuse a jury. In the context of the '044 patent, the term "stand-alone" could be interpreted to mean that the patent requires that the terminal computer be in a device or structure entirely separate from the card terminal. But the '044 patent does not require such a narrow construction. There is nothing in the intrinsic evidence to suggest that the terminal computer cannot be located within the same structure as the card terminal.

It is true, as Defendants point out, that the specification states that for the terminal computer, "a personal computer will be sufficient in most cases." Defs.'s Br. at 18; J.A., Exh. A at 9, '044 Patent (Col. 3, Lines 28-29). But this language is by no means limiting. It merely provides an example of what, in most cases, will work for the terminal computer. That is not to say that other devices, outside of a personal computer, cannot be used. Nor is it to say that the computer must stand on its own in a device separate from the card terminal. Accordingly, because use of the term "stand-alone" could be interpreted to improperly limit the patent's claims, the Court rejects its use here.

The Court, however, agrees that the terminal computer must be connected by a wire to the *card terminal*; remember, the term is "wire-connected terminal computer." Smart Systems suggests that the patent is ambiguous in regard to what the terminal computer must be connected to by wire. In other words, Smart Systems contends that the terminal computer just needs to be connected to some part of the system by wire, not necessarily that it must be connected to the *card*

*terminal* by wire. Pl.'s Resp. Br. at 22. For example, Smart Systems suggests that it could be connected to the central computer by wire instead.

But the claim language itself suggests that Smart Systems is wrong. The term "wire-connected" is found only in the part of the claims describing how the card terminal and the terminal computer communicate: "said card terminal, … receiving said card number data by RF, and transmitting the card number data, received through a radio frequency, to a wire-connected terminal computer for an inquiry to a black list." J.A., Exh. B at 2, Reexam. Certificate '044 Patent (Col. 1, Lines 32-37) (language taken from Claim 1; other Claims use similar language). It is not until the next paragraph that the claims introduce the central computer, and describe how the terminal computer then checks the card number against a black list that is updated periodically from a central computer. *Id.* (Col. 1, Lines 38-44). In that paragraph, the term "wire-connected" is *not* used. This placement (or lack of it) of the term "wire-connected" is telling. It stands to reason that, at the very least, the terminal computer must be connected by wire to the card terminal. To be sure, it is possible that the terminal computer might also be connected by wire to the central computer, but the claim language does not suggest such a connection is necessary—as it does with the card terminal.

The specification further supports a finding that the described wire-connection is between the card terminal and the terminal computer, and not with the central computer. The specification describes the system of the "present invention" as including only an RF card, a card terminal, and a terminal computer.

28

J.A., Exh. A at 9, '044 Patent (Col. 3, Lines 7-8) ("[T]he system of the present invention includes an RF card 40, a card terminal 70 and a terminal computer 80."); *see also id.* at 8 (Col. 2; Lines 30-46) (describing the "present invention" as including "an RF card, [which] … transmit[s] its own card number to the card terminal, the card terminal, [which] … transmit[s] a card number data to a terminal computer; and the terminal computer reading the card number data … to make an inquiry to a black list, … and to make a decision for issuing an approval of a transaction or a disapproval"). It does not identify the central computer as being a part of the invention. This is likely why in Figure 2 the central computer is connected to the terminal computer by a dashed line, as opposed to a solid line like the one connecting the terminal computer to the card terminal. All of this evidence suggests that the critical connection, and where having a wired-connection would make the most sense, is between the card terminal and the terminal computer.

Given where the term "wire-connected" is found in the independent claims, and the descriptions provided in the specification, the claims must be read to require that the terminal computer be connected by a wire to the card terminal. The Court thus construes the term "wire-connected terminal computer" to mean a computer that is separate from the card terminal that is connected to the card terminal by a wire.

### F. Black List Inquiry

The last term in dispute is the following:

Said terminal computer reading the credit card number from said card
terminal to make an inquiry to a black list which is updated from a

central computer periodically or intermittently, to a make a decision for issuing an approval of the transaction or a disapproval of the transaction, and to transmit the result of the decision to said card terminal.

J.A., Exh. B at 2, Reexam. Certificate '044 Patent (Col. 1, Lines 38-44). Defendants contend that the Court should construe this clause as follows:

the terminal computer (i) reading the credit card number from the card terminal, (ii) using the credit card number to make a decision for issuing an approval or a disapproval of the transaction based *only* upon an inquiry into a black list (which is updated from a central computer periodically or intermittently), and (iii) transmitting the result of the decision to the card terminal.

Defs.'s Br. at 20 (emphasis added). Smart Systems, on the other hand, contends that the clause does not need a construction, or in the alternative, that if the Court determines that a construction is necessary, then the Defendants' proposed construction is sufficient so long as the word "only" is removed. Pl.'s Resp. Br. at 23. Thus, Smart Systems' only objection is to the Defendants' contention that the only inquiry the terminal computer makes when approving or disapproving a transaction is to the black list, and that no other criterion may be used for the approval decision. *Id.*

As a threshold matter, the Court concludes that a construction would be helpful to a jury. But Smart Systems is correct in that the addition of the word "only" is inappropriate here. The word "only" is not found in any of the independent claims. The claims merely state that the "terminal computer … make[s] an inquiry to a black list … to make a decision for issuing an approval … or a disapproval of the transaction." J.A., Exh. B at 2, Reexam. Certificate '044 Patent (Col. 1, Lines 38-44). Although the claims do suggest that there is an inquiry to a black list, the

claims do not state that the *only* inquiry the terminal computer may make when approving a transaction is to a black list. At a minimum, an inquiry to a black list must be made, but that is not to say that additional inquiries may not also be conducted in addition to the inquiry into the black list.

Defendants contend the specification provides support for their addition of the word "only." Defs.'s Br. at 21; Defs.'s Reply Br. at 13. Specifically, Defendants point to a statement in the specification describing how the '044 patent's "credit card payment system" can be applied "to traffic means." J.A., Exh. A at 10, '044 Patent (Col. 5, Lines 28-29). In describing how this could be done, the specification states: "Here, at the boarding terminal of the traffic means, the approval of the transaction is decided based only upon the inquiry into the black list." *Id.* (Col. 5, Lines 51-53). Defendants contend that this statement shows that the "present invention" is limited to an inquiry into only a black list. Defs.'s Br. at 21. But Defendants' argument misses the mark. It is true that the preferred embodiment of the '044 patent enables a decision based only on the black list. But, as Smart Systems rightfully points out, there is nothing in the '044 patent that explicitly precludes using other criteria as well. Indeed, the independent claims merely state that they are "compris[ed]" of the following elements, not that they are limited to those elements. *See Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 811 (Fed. Cir. 1999) (the signal "comprising" is "generally understood to signify that the claims do not exclude the presence in the accused apparatus or method of factors in addition to those explicitly recited"). Thus, the Court rejects the inclusion of the

word "only" in the construction of this term, and instead, adopts the Defendants' proposed construction without it.

## IV. Conclusion

In sum, the Court construes the disputed terms as follows:

| Disputed Term | Construction |
|---|---|
| • Credit Card | • A card allowing purchases on credit |
| • Card Number, Card Number Data, Credit Card Number | • The number on the credit card account |
| • Credit Card System | • No construction necessary |
| • An antenna coil wound around the inner edges of said RF card within said card several times and an IC disposed within said antenna coil | • An antenna coil wound around the entire periphery of the radio frequency card with an integrated circuit disposed within the antenna coil |
| • Wire-connected terminal computer | • A computer that is separate from the card terminal that is connected to the card terminal by a wire |
| • Said terminal computer reading the credit card number from said card terminal to make an inquiry to a black list which is updated from a central computer periodically or intermittently, to a make a decision for issuing an approval of the transaction or a disapproval of the transaction, and to transmit the result of the decision to said card terminal | • The terminal computer (i) reading the credit card number from the card terminal, (ii) using the credit card number to make a decision for issuing an approval or a disapproval of the transaction based upon an inquiry into a black list (which is updated from a central computer periodically or intermittently), and (iii) transmitting the result of the decision to the card terminal |

ENTERED:

_____s/Edmond E. Chang_____
Honorable Edmond E. Chang
United States District Judge

DATE: January 8, 2016